**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE,      )
                                   )

      v.                         )     ID Nos. 2008012017
                                   )              2204003380

TARIQ MARINEY,        )
                                   )

      Defendant.      )

## ORDER DENYING POSTCONVICTION RELIEF

### INTRODUCTION

On April 26, 2023, Tariq Mariney moved this Court for postconviction relief ("Motion") from his June 21, 2022 convictions for Possession of a Firearm by a Person Prohibited and Drug Dealing.[1] Mariney argues he is entitled to relief under Superior Criminal Court Rule 61 ("Rule 61") because his December 20, 2021 suppression motion was improperly denied.[2] This Court concludes Mariney's Motion lacks merit and must be DENIED.

### BACKGROUND

Probation is an act of grace[3] through which a convicted criminal offender, sentenced to Level V incarceration, is permitted to remain at liberty under the

---

[1] *See* Docket Item ("D.I.") 27, 32, 37 in Case ID. Nos. 2008012017/ The facts in this decision reflect the record developed at the May 18, 2022 suppression hearing. D.I. 34. Citations to the hearing transcript are in the form "Tr. #."

[2] *See* D.I. 14, 37.

[3] *Kurzmann v. State*, 903 A.2d 702, 716 (Del. 2006).

1

supervision and rules of the Office of Probation and Parole ("P&P"). Mariney broke these rules. Despite being subject to intensive supervision, Mariney tested positive for cocaine and marijuana on several urine screens and provided the wrong home address to P&P.[4] Operation Safe Streets conducts home visits for probationers who are noncompliant with supervision.[5]

On the morning of August 25, 2020, probation officer Kevin McClure led a nine-man Operation Safe Streets Team ("OSS Team") to conduct a routine curfew check at 606 North Washington Street, Apartment 2, in Wilmington, Delaware.[6]

---

[4] Tr. 13:8–18, 14:9–15:8.

[5] *Id.* at. 12:15–20, 69:6–11. The purpose of the visit was to ensure Mariney's compliance with conditions of his supervision because of his prior history. Tr. 64:10–14.

OSS is a local crime-reduction initiative, Department of Community Corrections assists Wilmington police officers in conducting "home visits . . . community contacts, curfew checks, contacting offenders involved in suspicious activities or violating conditions of supervision, arresting them when necessary, and doing searches when appropriate." *Id.* 5:16–6:18. McClure testified that "one of the assignments or mandates, if you will, of Safe Streets is we are assigned to people that are . . . classified high risk based upon curfew or . . . the fact that they're on intensive supervision. So it doesn't necessarily have to be the probation officer assigned to that person to go out and contact them." *Id.* 10:22–11:11.

McClure further explained that Department of Correction Procedure ("DCP") 7.3 provides the purpose of home visits is: "[t]o verify the residence, that the person is actually living there[;]" making a "collateral contact" in the event "you can't contact the offender in case of an emergency[;]" to "view the home environment that they're in" to enforce no-contact orders and "gather who's living there[;] . . . to understand the layout of the house . . . for future home visits[;]" and to "ensure compliance with the supervision conditions that were assigned to that person." *Id.* 9:14–10:17.

[6] *Id.* 12:15–20. Nine OSS members executed the home visit: probation officers McClure, Collins, Scioli, and Phelps and police officers Evans, McNamara, Nolan, Wiggins, and Rosaio; each were assigned individual responsibilities—probation officers were properly trained to do the searching, and police officers provided security and secured the evidence seized. *Id.* 29:10–18, 34:14–35:3. Conducting a home visit requires a minimum of two team members; they typically "ride four . . . or three deep." *Id.*. 65:19–66:2.

2

Mariney, who had been celebrating his birthday the night before, awoke to loud knocks at his door.[7] The OSS Team spotted a man peeking through a window and Officer McClure motioned and asked to him to come to the door.[8] Mariney asked, "[W]ho's there[?]"[9] Officer McClure identified himself and Mariney replied he needed to get dressed.[10] Moments later, Mariney opened the door wide—which the OSS Team understood as an invitation to enter the premises.[11] Mariney was wearing shorts but no shirt.[12] His mouth was caked with a white substance resembling cocaine.[13] Aside from Mariney's disheveled look, delay in answering the door, and the white substance on his mouth, there were other red flags.

---

[7] Mariney submits he was "pretty intoxicated" from celebrating his birthday the day before the home visit. Tr. 73:11–20.

[8] *Id*. 15:12–16:4. *But see id*. 70:22–71:3 (Mariney denies peeking through the window).

[9] *Id*. 15:15–17. This Court gave little credibility to Mariney's testimony regarding his surprise when he opened the door to eight officers who purportedly bum-rushed their way into his home and immediately put him in handcuffs as they searched the apartment. *Id*. 69:20–70. *See* Tr. 36:3–37:19 (the OSS Team was easily identifiable as law enforcement officers because they were wearing tactical vests and badges), *Id*. 17:13–18:1 (McClure testified: "It's odd that you would ask . . . who's there when you've looked out the window and you've seen uniformed law enforcement officers there. I mean . . . you know who's there. So that raises a flag for me, number one. I guess number two, it is odd when you say you're getting dressed and then you just come to the door and you just have a pair of shorts on. . . . It's just in my experience people that delay coming to the door, it's usually because they're trying to hide things."). Moreover, Mariney was on Level III probation in August 2020, requiring Mariney to allow officers into his home to conduct a home visit. *Id*.. 74:4–8.

[10] *Id*. 15:18–21.

[11] *Id*. 16:14–17:7, 49:11–50:11, 69:13–20.

[12] *Id*. 17:18–21, 69:15–17.

[13] *Id*. 50:1–8

The second-story apartment was modest—it had a living room, galley kitchen, long hallway, and one bed and bath.[14] Upon entry, the OSS Team immediately noticed contraband and drug paraphernalia in plain view.[15] A hookah pipe was in the living room.[16] Ziploc baggies containing green vials commonly used to store crack cocaine rested in a little cart next to the kitchen.[17] A marijuana blunt balanced on an ashtray.[18] A razor blade and a small-cut straw were perched on the microwave—a white substance blotched the razor blade, indicative of drug use.[19]

Because of the visible contraband and drug paraphernalia in plain view, the OSS Team detained Mariney.[20] Upon learning there were other occupants in the

---

[14] *Id.* 19:7–13, 56:16–21.

[15] *Id.* 18:15–17, Tr. 19:7–13, 56:16–21.

[16] *Id.* . 18:20–19:7, 47:12–20 (McClure explained that "a hookah pipe is . . . a water pipe . . . used to smoke shisha or flavored tobacco, but you can also smoke marijuana out of it. They call it dirty hookah."), 19:19–20:4 (the clear plastic baggies "had what they call on the street 'trash cans', but they're little vials that you open, they're tiny, and you store drugs in them. Mostly it's crack cocaine.") (internal quotations added), Tr. 51:1–16 (the plastic baggies containing the vials were in a little cart protruding next to the kitchen).

[17] *Id.* 18:20–19:7, 47:12–20 (McClure explained that "a hookah pipe is . . . a water pipe . . . used to smoke shisha or flavored tobacco, but you can also smoke marijuana out of it. They call it dirty hookah."), 19:19–20:4 (the clear plastic baggies "had what they call on the street 'trash cans', but they're little vials that you open, they're tiny, and you store drugs in them. Mostly it's crack cocaine.") (internal quotations added), Tr. 51:1–16 (the plastic baggies containing the vials were in a little cart protruding next to the kitchen).

[18] *Id.* 21:7–9, 23:4–18 (Mariney t's probation had several conditions: he was not to consume of possess any controlled substances or dangerous drugs unless prescribed lawfully, and he was subject to random testing as directed by his supervising officer). Mariney submits he smoked marijuana the day before the search. Tr. 73:20–74:3.

[19] *Id.* 20:10–18, 51:22–52:12 (McClure avers that "people either use [the razor blade and small-cut straw] for . . . cocaine; or if they're snorting pills, they'll cut pills as well too.").

[20] *Id.* 23:19–21, 47:1–16.

apartment, the OSS Team also brought Mariney's girlfriend, Kyssa Allen, who was holding their baby, into the living room.[21]

Officer McClure contacted his direct supervisor, Carlos Pini, to get approval for a search warrant.[22] Pini approved the search because of the drug paraphernalia in plain view and Mariney's pending violations of probation for missed curfews and multiple positive urine screens.[23]

During a subsequent search of the bedroom, pursuant to the warrant, Officer McClure noticed a blue Nike fanny pack partially sticking out from underneath a dresser drawer.[24] Inside the fanny pack was a loaded 9-mm Jiminez handgun, with a round in the chamber.[25] Mariney's ID was on the bedroom bureau.[26] The OSS Team took Mariney's ID, cell phone, razor blade, drug baggies, and fanny pack containing

---

[21] *Id.* 20:7–9, 45:15–46:20.

[22] *Id.* 23:21–24:17. McClure testified that he held a telephonic conference with his supervisor to discuss whether there was sufficient reason to believe Mariney was in possession of contraband thus violating probation, whether the information from the confidential informant ("CI") was corroborated, and approval for the search. Tr. 23:21–24:10. McClure further testified that "normally . . . if you had information that you were going to go out and actually do a search, it would be a different procedure where you would be sitting in an office and you'd be having a discussion face to face. This was a home visit. There was not a search that we knew was going to happen, so it was a telephonic conference." Tr. 25:16–23.

[23] *Id.* 26:12–27:23, 40:21–41:6, 41:12–42:8 (the OSS Team was following up on Mariney because he had an "outstanding offensive touching charge" and "issues as far as not being home for curfew").

[24] *Id.* 54:2–12.

[25] *Id.* 32:19–23 (it was loaded with 11 rounds including the round in the chamber), 55:12–23.

[26] *Id.* 45:5–9.

the handgun into evidence.[27] Because the owner of the handgun was unclear, they detained both Mariney and Allen.[28]

The State indicted Mariney on one count of Possession of a Firearm by a Person Prohibited ("PFBPP"), one count of Possession of Ammunition by a Person Prohibited ("PABPP"), and one count of Possession of Drug Paraphernalia.[29] Mariney was later reindicted to add additional charges against him.[30]

Mariney moved to suppress all evidence from the search of his apartment, including the drugs, paraphernalia, and DNA evidence, and inculpatory statements he made during his arrest and interrogation.[31] Prior to the suppression hearing, Mariney who remained at liberty, was arrested a second time on April 8, 2022 and charged with two counts of Drug Dealing, one count of Conspiracy in the Second Degree, one count of Endangering the Welfare of a Child and one count of Possession of Drug Paraphernalia.

On May 19, 2022 hearing, following a hearing, this Court denied suppression because the home visit by the OSS Team was permissible to ensure Mariney's

---

[27] *Id.* 56:23–57:8.

[28] *Id.* 57:8–58:3.

[29] D.I. 2.

[30] D.I. 7.

[31] *See* D.I. 14.

6

compliance with probation and to verify his residence; OSS procedures were properly followed; and the search was constitutional.[32]

On June 21, 2022, Mariney pled guilty to one count of PFBPP in Case No. 2008012017 and one count of Drug Dealing in Case No. 2204003380.[33] At the same hearing, Mariney was sentenced to 15 years at Level V followed by lesser levels of incarceration and probation.[34]

Following the plea and sentencing hearing, on August 31, 2022, Mariney moved *pro se* to modify/reduce his sentence based on ineffective assistance of counsel.[35] This Court denied the motion to modify/reduce his sentence on November 29, 2022, reasoning that by entering into a plea agreement, Mariney understood the statutory penalty of a mandatory minimum of 10 years for PFBPP.[36] Mariney did not take a direct appeal.

On April 26, 2023, Mariney moved this Court for postconviction relief and appointment of counsel.[37] Mariney contends his plea agreement was the product of

---

[32] Tr. 102:10–104:2,

[33] D.I. 32, D.I. 46 at A234 (". Mariney agrees he is a[] habitual offender and therefore subject to sentencing pursuant to 11. Del. C. § 4214(c) [sic]. Although eligible to be sentenced as a habitual offender . . . by accepting this plea the State agrees to not file the habitual offender petition.").

[34] D.I. 33.

[35] D.I. 35.

[36] D.I. 36.

[37] D.I. 37–38.

unreasonable search and seizure.[38] In November 2023, this Court appointed Ben Gifford ("Postconviction Counsel") to represent Mariney.[39] On April 15, 2024, Postconviction Counsel moved to withdraw as counsel under Rule 61(e)(6).[40] On May 8, 2024, Mariney responded to Postconviction Counsel's withdrawal motion rearguing issues already decided at the suppression hearing..[41] Trial Counsel responded to Mariney's Motion later that month.[42]

## DISCUSSION

Delaware Superior Court Criminal Rule 61 provides incarcerated individuals a chance to seek redress from a prior sentence of this Court by "setting aside a judgment of conviction" because this Court "lacked jurisdiction to enter the judgment or on any other ground that is a sufficient factual and legal basis for a collateral attack upon a criminal conviction."[43]

To make this determination, this Court must consider procedural bars to relief before reaching the merits of any such claims: (1) the motion must be filed within one year after the finality of a conviction or a retroactive right; (2) repetitive motions

---

[38] D.I. 37.

[39] D.I. 41.

[40] D.I. 45, 46.

[41] D.I. 47.

[42] D.I. 48.

[43] Super. Ct. Crim. R. 61(a)(1).

are prohibited unless certain requirements are met; (3) issues not raised before conviction are deemed waived unless cause or prejudice is shown; and (4) claims already finally adjudicated on the merits are precluded.[44]

Defendant seeks postconviction relief for "conduct that the lawyer knows to be illegal or fraudulent."[45] This is Defendant's first postconviction relief motion and it is timely, but his claim has already been decided on its merits; thus, it is precluded from being re-heard because it has already been adjudicated on the merits. Indeed, Defendant's claim ineffective assistance of counsel appears to be a rehashing of his motion to suppress rather than a claim of ineffective assistance of counsel. Because the motion to suppress was already decided at the suppression hearing, Defendant's claim for postconviction relief is precluded from being heard on its merits. And even if Defendant clears that procedural bar, he still loses on the merits.

The Motion again challenges the reasonableness of the search and seizure that led to his conviction. Mariney argues the probation officers acted outside the scope of their duties. Put differently, was the evidence seized from Mariney's residence fruit of the poisonous tree? This issue sounds familiar because it has already been raised, argued, and decided. The instant Motion argued that 11 *Del. C.* § 4321 is unambiguous and limits a probation officer's search to the person, not their home.

---

[44] *Id.* at (i)(1–4)

[45] D.I. 36.

Delaware courts have consistently recognized the authority of probation officers to search individuals' homes under 11 *Del. C.* § 4321 and Parole and Probation Procedures 7.19 and 7.3. Subsection 4321(d) provides that probation officers may direct searches of individuals on probation—particularly offenders.[46] Procedure 7.19 explains that probation officers should undergo a conference with their supervisor before conducting a search for exigent circumstances.[47] Procedure 7.3 states that probation officers may organize a home visit to monitor compliance with the conditions of supervision or to verify their residence, among other things.[48]

---

[46] 11 *Del. C.* § 4321(d) ("Probation and parole officers shall exercise the same powers as constables under the laws of this State and may conduct searches of individuals under probation and parole supervision in accordance with Department procedures while in the performance of the lawful duties of their employment and shall execute lawful orders, warrants, and other process as directed to the officer by any court, judge or Board of Parole of this State[.]"

[47] Del. Dep't of Corr. Bureau of Cmty. Corrs. Prob. & Parole Proc. ("Procedure") No. 7.19 (explaining that an arrest-search checklist is "a form used to facilitate a case conference between the Officer, who is seeking an arrest or search action and his immediate Supervisor[,]" which "contains the following sections: Arrest Decision Factors, Arrest Strategy, Decision to Search, and Search Strategy[;]" and exigent circumstances exist when "unexpected or urgent event which did not allow an opportunity for prior planning, and which requires immediate action to achieve a successful resolution"); D.I. 14 at Ex. D. *See also Walker v. State*, 205 A.3d 823, 824–25 ("Procedure 7.19 requires the following: The officer and supervisor will hold a case conference. . . . During the case conference the supervisor will review the 'Yes' or 'No' responses of the officer to the following search decision factors: (1) Sufficient reason to believe the offender possess contraband[;] (2) Sufficient reason to believe the offender is in violation of probation[;] (3) Information from a reliable informant, indicating offender possesses contraband or is violating the law[;] and (4) Information from the informant is corroborated.") (citing *Culver v. State*, 956 A.2d 5, 10 (Del. 2008)). *See also State v. Groce*, 2024 WL 1463417, at *1 (Del. Super. Apr. 4, 2024) (denying a motion to suppress where the search of the defendant's home was authorized by Subsection 4321(d)).

[48] Procedure No. 7.3(H)(2)(a–i) ("The purpose of a home visit is to: verify the offender's residence; observe the home environment; identify the interpersonal relationships of residents; identify any relationships not permitted; meet the residents of the home and explain why the home visit is necessary; solicit the residents support for the offender; establish a collateral contact, if possible;

10

This Court's recent holding in *State v. Young* is instructive.[49] There, the defendant, who was on Level III probation, was detained for violating curfew.[50] An approved administrative search of his home revealed large amounts of drugs, paraphernalia, and cash.[51] Following indictment, the Mariney moved to suppress the evidence found at his residence, arguing that Subsection 4321(d) unambiguously limited warrantless searches to individuals.[52] This Court reasoned that Subsection 4321(d) was ambiguous, but denied the motion to suppress, following Delaware precedent which establishes that "searches of individuals" includes "probationer's homes as well as their persons."[53] Likewise, in *State v. Swiggett*, this Court denied a

get familiar with the layout of the house and the neighborhood for future visits; and monitor compliance with the conditions of supervision and sentencing order."); D.I. 14 at Ex. C.

[49] 314 A.3d 688, 691 (Del. Super. 2024).

[50] *State v. Young*, 314 A.3d 688, 691 (Del. Super. 2024).

[51] *Id.*

[52] *Id.*

[53] *Id.* at 691– ("Subsection 4321(d) is ambiguous because there are two reasonable, but divergent, interpretations of its plain language. After reviewing the pertinent legislative history for House Bill 524, the Court finds that the legislature's intent was for 'searches of individuals' to include probationer's homes as well as their persons. This finding is further buttressed by the legal principle of *stare decisis*. . . . [B]ecause Procedure 7.19 authorizes warrantless searches of probationers' homes and vehicles as well as their persons, the statutory language authorizes such searches. . . . [D]uring the deliberations, no member of the House expressed an opinion or belief that the practice of searching probationers' homes was unconstitutional, nor is there any evidence to that effect was ever provided to the full chamber. . . . [T]he Supreme Court has judicially construed Subsection 4321(d) to authorize searches of probationers' homes . . . [and] there has been no amendment or material change to Subsection 4321(d) since its enactment in 1990. . . . [W]hile the General Assembly has been provided the opportunity to consider modifications to Subsection 4321(d) as it has considered, and enacted, other changes to Section 4321 as a whole, it has chosen not to do so, thus indicating its acquiescence in the long-standing judicial and administrative interpretation of the provision.") (citing *State v. Barnes*, 116 A.3d 883 (Del. 2015)) (citations omitted). *See also Walker v. State*, 205 A.3d 823, 826 (Del. 2019) (reversing the lower

motion to suppress where the seized evidence was in plain view during a home visit.[54] There, during a walk-through of the defendant's residence, probation officers observed and confiscated drug baggies in an uncovered trashcan on the defendant's balcony.[55] Following indictment, the defendant moved to suppress such evidence.[56] This Court denied the suppression motion, holding that "the walk-through permits a probation officer to observe anything in *plain view*; such as contraband lying on a table, pornography on a computer screen, a gun hanging on the wall, or other reasonable grounds."[57]

Here, the record evinces the OSS Team followed proper procedures. Mariney compelled a home visit by repeatedly violating conditions of his probation. He invited the OSS Team into his home and paraphernalia and drugs were in plain view, which raised probable cause to execute an administrative search. McClure contacted his direct supervisor, and they considered the administrative arrest-search checklist before Pini granted the search. Following his indictment, Mariney had full opportunity to challenge the prosecution. Mariney's claim that Trial Counsel "did

---

court's denial of a motion to suppress in a violation of probation proceeding where "there was no attempt to comply with basic aspects of the probation procedures"); *McAllister v. State*, 3 A.3d 1098, 1098 (Del. 2010) (TABLE) (denying a postconviction relief claim where the administrative search procedures were followed)

[54] 2019 WL 245292, at *3 (Del. Super. Jan. 15, 2019).

[55] *Id.* at *1.

[56] *Id.* at *2.

[57] *Id.* at *3 (quoting *Wallace v. State*, 62 A.3d 1192, 1196 (Del. 2012)).

12

not put [the State's] case through a[n] adve[rsar]ial test" is incorrect.[58] This Court held a suppression hearing during which both parties presented evidence, witness testimony, and closing arguments.[59] After this Court denied suppression, Mariney voluntarily pled guilty. In short, Mariney's claim for postconviction relief would fail even if it were addressed on its merits. And if Mariney sought to reargue his suppression motion, he should have appealed or continued to trial.

## CONCLUSION

In sum, Mariney's claim of ineffective assistance of counsel lacks both factual and legal merit; thus, this Court denies his application for postconviction relief. This Court recognizes Mariney's disapproval concerning the length of his sentence, but rejects Mariney's claims that he entered the plea agreement unknowingly and involuntarily. The Truth-in-Sentencing Guilty Plea Form bearing Mariney's signature indicates the minimum penalty range as "10 years" and he "freely and voluntarily" entered the guilty plea.[60] Mariney understood his plea agreement and his Motion merely rehashes suppression arguments already decided by this Court; thus, it is procedurally barred from being heard on its merits.

---

[58] D.I. 36.

[59] *See* D.I. 34.

[60] D.I. 32. Although no transcript for Mariney's plea colloquy or sentencing exists, the record provides sufficient evidence to tackle his claims.

This Court finds Trial Counsel was effective in his services. Mariney's Motion is, therefore, DENIED. Trial Counsel's motion to withdraw as counsel is GRANTED.

**IT IS SO ORDERED.**

___/s/ Kathleen M. Vavala_____
The Honorable Kathleen M. Vavala